# Craddock v. Viechnicki

C.P. of Lehigh County, no. 2003-C-2289V.

*Nancy H. Fullam* and *Gregory A. Smith,* for plaintiffs.

*Joseph M. Kelly* and *John R. Hill,* for defendants.

McGINLEY, *J.,* February 3, 2006—Before this court are the post-trial motions of plaintiffs who ask us to vacate the jury verdict returned on August 12, 2005, and grant a new trial. This is a claim of medical malpractice, wherein plaintiffs alleged that defendant Bruce Viechnicki M.D., fell short of the appropriate standard of care in his prenatal treatment of plaintiff, Jessica Craddock, resulting in the stillbirth of Madison Craddock. The jury returned a verdict for the defendant, finding no negligence on defendant's behalf. Plaintiffs' counsel argues that a new trial is necessary because of evidentiary ruling errors, erroneous jury procedures and "judicial bias" against the plaintiffs.

## PROCEDURAL HISTORY

Plaintiffs filed an amended complaint on December 8, 2003. On September 13, 2004, defendant filed an answer to plaintiffs' amended complaint.

Trial commenced on August 8, 2005, and a jury verdict in favor of the defendant was returned on August 12, 2005.

Plaintiffs motioned for post-trial relief on August 22, 2005. Plaintiffs filed a brief in support of the motion for post-trial relief on October 18, 2005. Defendant filed a brief in opposition to plaintiffs' motion for post-trial re-

lief on November 14, 2005. Argument was heard on November 28, 2005.

## FACTUAL HISTORY

Defendant, Bruce Viechnicki M.D., is an obstetrician/gynecologist. Plaintiff, Jessica Craddock, visited defendant at his office a total of 11 times for prenatal care throughout the course of her pregnancy, the first visit being in February 2001.

On April 3, 2001, Jessica Craddock visited Dr. Viechnicki's office for the purpose of obtaining a maternal serum triple screen. The results indicated a low estriol level of 0.6 MOM. The test at this stage of the pregnancy is administered primarily for the purpose of identifying chromosomal abnormalities in the fetus, such as Down Syndrome. The child, Madison, did not suffer from any such condition.

On July 19, 2001, at 32 weeks of gestation, plaintiff Jessica Craddock presented herself to defendant for a regularly scheduled prenatal examination. At this examination, defendant failed to measure and record Mrs. Craddock's fundal height development. Defendant did note plaintiff's weight to be 166 pounds at the time of examination. At all other visits of the plaintiff to the defendant's office, this measurement was taken and recorded.

On August 13, 2001, defendant saw plaintiff again for a regular examination. On that occasion, plaintiff's fundal height was measured as 32 centimeters. Defendant next saw plaintiff after 38 weeks of gestation, on September 6, 2001. During this visit, plaintiff noted feeling less fetal movement than she was used to. Defendant

performed the usual physical exam, but ordered no additional tests. He informed plaintiff that she was fine and sent her home. Expert testimony established that such symptomatology is normal at that stage in a pregnancy.

On September 9, 2001, plaintiff went into labor and checked into St. Luke's Hospital for delivery. Upon initial evaluation, the attending nurse was unable to measure any fetal heart tones. Doppler and ultrasound later confirmed that the baby's heart was not beating, and the baby had been lost *in utero.*

Although plaintiff wanted to have a Caesarian section to remove the baby, defendant recommended a vaginal birth. Upon defendant's request, Dr. Albert Sarno, a staff physician at St. Luke's, spoke with the plaintiff, who then acquiesced to delivering the child vaginally. On September 11, 2001, plaintiff gave birth to a stillborn baby, Madison Craddock.

Trial began on August 8, 2005, in which plaintiff attempted to show that defendant's medical treatment of plaintiff fell below the standard of care due to defendant's alleged failure to measure and accurately track fundal height development, and defendant's failure to order additional testing in light of low estriol levels and decreased fetal movement.

On August 12, 2005, a verdict was returned against plaintiffs and in favor of defendant, finding no deviation from the applicable standard of care.

## DISCUSSION

Plaintiffs seek a new trial in this matter, arguing that the trial court erred by: precluding certain testimony of

Dr. Albert Sarno, not allowing cross-examination of Dr. Viechnicki with an authoritative text, requiring "pre-screening" of impeachment materials, limiting impeachment of Dr. Larry Glazerman, not allowing admission of Dr. Viechnicki's personal files into evidence, limiting evidence of possible alcohol use by the defendant, allowing evidence regarding plaintiff's drug and alcohol use, giving erroneous jury instructions, placing time limits on jury deliberations, disjoining the jury verdict into two separate questions, making an improper verdict slip, failing to make a record of plaintiffs' motion to strike Juror 28, allowing the tipstaff to make inquiries to the jury, failing to recuse, and acting in an "intemperate" manner.

In response, defendant argues that the trial court acted appropriately because Dr. Sarno, as an expert witness, could choose to forego testifying, the texts plaintiffs sought to use on cross-examination were not established as authoritative, the court's order for both parties to discuss the authoritative texts before using them for testimonial purposes was properly aimed at ensuring that the use of the learned treatises was both "judicious" and "limited," the proposed cross-examination of Dr. Glazerman was irrelevant, it would be improper to submit Dr. Viechnicki's medical charts to the jury, Robert Mohring's statements regarding Dr. Viechnicki's possible intoxication were unsubstantiated and were properly denied admittance, and evidence regarding plaintiff's drug and alcohol use following the death of her child was properly admitted as it was directly relevant to disproving the damages claimed by plaintiff and was not unfairly prejudicial.

Furthermore, defendant argues that the jury instructions were entirely appropriate given the facts of the case and the evidence presented, the trial court placed no time restrictions on the jury's deliberation, the division of the questions submitted to the jury was appropriate in order to simplify jury deliberations, the verdict slips were proper and there is no evidence that there was influence exerted by the judge's staff on the jury.

Finally, with respect to alleged "judicial bias," defendant argues firstly that even if any acrimony existed, it was not exposed to the jury and, hence, had no prejudicial effect on the verdict, and defendant secondly argues that not only was recusal unnecessary for the trial judge, but also, that plaintiff waived the right to disqualify the judge after the verdict was reached.

Trial courts have broad discretion to grant or deny a new trial. *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 465, 756 A.2d 1116, 1121 (2000). A trial court may grant a new trial if there was a clear abuse of discretion or an error of law which controlled the outcome of the case. See *Spang & Company v. U.S. Steel Corporation,* 519 Pa. 14, 545 A.2d 861 (1988). "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Harman,* 562 Pa. at 469, 756 A.2d at 1123. Furthermore, as a general rule, questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court. *Lewis v. Pruitt,* 337 Pa. Super. 419, 487 A.2d 16 (1985). It is with this standard in mind that we turn to the matters asserted by plaintiffs.

## EVIDENTIARY RULINGS

### *Dr. Sarno's Testimony*

Plaintiffs first assert that the trial court abused its discretion when it limited the testimony of Dr. Albert Sarno.

Dr. Sarno, a staff perinatologist at St. Luke's Hospital, became involved in this matter after Madison Craddock was found to have no heartbeat on September 10, 2001. Upon the request of the defendant, who was unable to reason with the plaintiff, Dr. Sarno successfully convinced Jessica Craddock to give birth to the stillborn baby vaginally as opposed to doing so by Caesarian birth. Dr. Sarno had this conference with Jessica Craddock following a consultation with Dr. Viechnicki about how to best deliver the child.[1]

In the course of his treatment, Dr. Sarno created two documents describing his consultation with Jessica Craddock. One of these documents, dated September 10, 2001, was a handwritten record of Dr. Sarno's observations made in the course of his treatment of Jessica Craddock on that day. This document is a record of treatment and is included in the hospital's record.[2] The next document prepared by Dr. Sarno, dated September 13, 2001, was addressed to Dr. Viechnicki, described Jessica Craddock's symptoms of September 10, 2001, and included a diagnosis of the condition leading to Madison Craddock's demise.

Finally, on December 6, 2001, months after any alleged negligence took place, Dr. Sarno sent a letter to the plaintiff voicing his opinion as to the cause of death

---

1. See N.T. motions hearing, Aug. 4, 2005 at 8.
2. See *id.* at 11.

of Madison Craddock, and opining how to best treat Jessica Craddock in the future.[3] The December 6, 2001 letter was not included in the hospital record.[4]

Plaintiffs' counsel subpoenaed Dr. Sarno to testify at trial. On August 4, 2005, Dr. Sarno's counsel, Richard Stevens, Esquire, filed a motion to quash the subpoena, arguing that Dr. Sarno's involvement in the matter began only after the death of Madison Craddock, and accordingly, the doctor had no personal knowledge of the events in question. Additionally, on August 9, 2005, defendant filed a memorandum of law in support of the motion to preclude expert opinion of Dr. Sarno, claiming that the December 6, 2001 letter was beyond the scope of Jessica Craddock's treatment and was clearly expert opinion.

After hearing argument, the trial court ordered the following:

"Now, August 9, 2005, the motion of Richard Stevens, Esquire, on behalf of Dr. Sarno, to strike the subpoena with regard to Dr. Sarno's testimony in this matter is denied in part and granted in part.

"It is granted insofar as Dr. Sarno is permitted to testify as to the consultation note and his letter of September 10. He is not compelled to testify with regard to his letter of December 6, 2001.

"The basis for our holding is the holding in *Jistarri v. Nappi,* 378 Pa. Super 583, 549 A.2d 210, Pennsylvania Superior Court 1988." (Trial Tr. vol. 2, 232:14 through 232:25.)

---

3. See *id.* at 14.
4. See *id.* at 12.

The trial court recognized that Dr. Sarno possessed factual testimony to give at this trial, namely, the specifics of his consultation on September 10, 2001, and the contents of the letter sent to Dr. Viechnicki, dated September 13, 2001. We allowed these two matters to be explored at trial, as they were within the realm of factual testimony based on Dr. Sarno's limited treatment of plaintiff, Jessica Craddock.

We did not permit plaintiffs' counsel to compel the testimony of Dr. Sarno with regard to his later report of December 6, 2001. Plaintiffs' counsel argues that the court erred because it classified Dr. Sarno's report of December 6, 2001, as expert opinion rather than the report of a treating physician.

Plaintiffs' counsel cites to *Miller v. Brass Rail Tavern Inc.,* 541 Pa. 474, 664 A.2d 525 (1995) and *Kurian ex rel. Kurian v. Anisman,* 851 A.2d 152 (Pa. Super. 2004). Plaintiffs' counsel's reliance on *Kurian* and *Miller* is misplaced. *Kurian* addressed the appropriateness of sanctions where an expert report was not timely filed. *Miller* decided whether a witness had sufficient credentials to qualify as an expert witness.

The December 6, 2001 letter was prepared months after Dr. Sarno's treatment of Jessica Craddock had ended and opined as to the cause of death of Madison Craddock, as well as gave an opinion as to how Jessica Craddock should proceed in the future. Despite plaintiffs' contention that the letter does not opine about "standard of care," an opinion about causation is still an opinion.

It is well established in Pennsylvania that an expert witness cannot be compelled to testify as to his opinion against his will. See *e.g., Jistarri v. Nappi,* 378 Pa. Su-

per. 583, 595, 549 A.2d 210, 216 (1988). "[T]he private litigant has no more right to compel a citizen to give up the product of his brain, than he has to compel the giving up of material things." *Pennsylvania Company for Insurances on Lives and Granting Annuities, Trustee v. Philadelphia,* 262 Pa. 439, 442, 105 A. 630 (1918).

In granting Dr. Sarno's motion to strike the subpoena with regard to the December 2001 opinion, we relied on the rationale of *Jistarri v. Nappi, supra.* In *Jistarri,* an expert witness, who was also a co-defendant in the case, did not wish to present his expert testimony at trial. The testimony in question was a doctor's deposition opining that the staph infection that ultimately killed the plaintiff was the result of an ulcer that formed underneath a cast that a co-defendant had applied. In like manner to the situation in this case, the opining doctor began treating the plaintiff after the alleged negligent act of the doctor who applied the cast. The trial court in *Jistarri* precluded portions of the opining doctor's deposition. Specifically, the trial court forbade the reading of portions of the doctor's deposition testimony in which he opined that the staph infection had entered the bloodstream under the cast applied by the co-defendant doctor.

The Superior Court in *Jistarri* affirmed the trial court's decision to preclude portions of the opining doctor's deposition, stating that the plaintiff "was not free to require [the opining doctor] to give expert testimony against his will . . . ." *Jistarri,* 378 Pa. Super. at 599, 549 A.2d at 218. The *Jistarri* court further stated, "the private litigant has no more right to compel a citizen to give up the product of his brain, than he has to compel the giving up

of material things." *Id.* (quoting *Pennsylvania Company for Insurances, etc., Trustee v. Philadelphia,* 262 Pa. 439, 442, 105 A. 630 (1918)).

As in *Jistarri,* Dr. Sarno prepared an opinion as to the cause of the plaintiffs' affliction. Moreover, the expert witness was a treating physician in a very limited capacity at some point following the alleged negligence by another physician. Also, in both cases, the opining doctor does not wish to testify as an expert witness. Finally, in both cases, the plaintiffs attempted to force the expert to testify. The holding of *Jistarri* is applicable to this case, and the expert witness cannot be compelled to give his testimony against his will.

It does not matter that the doctor never personally stated his desire to be relieved of testimony about his December 2001 opinion. When an attorney comes into court and conveys to the court that he represents a certain person, the attorney is acting as an officer of the court and has no additional requirement to prove either the fact of his representation or the substance of his position.

Finally, even if we were incorrect in our ruling prohibiting the testimony of Dr. Sarno with regard to his December 2001 opinion, there was no prejudice to the plaintiffs. Plaintiffs' counsel essentially introduced the substance of that opinion in her questioning of Dr. Sarno with regard to his other reports. Furthermore, plaintiffs' counsel made her point in her closing argument.

"Ms. Fullam: Now, he told you that the size and length were all normal. Dr. Sarno said she was 32 to 34 weeks in size. He said that she had severe intrauterine growth restriction, and he never took that back and he never

changed his mind." (Trial Tr. vol. 5, 1123:22 through 1124:1.)

*Use of Authoritative Texts/Learned Treatises*

Plaintiffs' counsel next asserts that the trial court abused its discretion when it refused to let the plaintiffs' counsel read excerpts from "authoritative texts" to the defendant and his expert witnesses during cross-examination.

Plaintiffs' counsel states the assignment of error in this regard too broadly, in that there are two different standards to be employed, one for the defendant and another for expert witnesses.

The first issue we ruled on was the use of "authoritative texts" in the cross-examination of the defendant himself.

At trial, the following exchange took place:

"Mr. Hill: I believe that Miss Fullam is going to be using some textbooks with Dr. Viechnicki's cross-examination, and I guess we'll wait to see what happens at that time of cross-examination.

"The Court: Well, are you asking for an offer of proof?

"Mr. Hill: I guess offer of proof as to the textbooks, your honor, because I'm not aware that the doctor indicated he found anything authoritative." (Trial Tr. vol. 1, 142:3 through 142:13.)

Plaintiffs' counsel then stated that she had certain material [she] intend[ed] to try to use in impeachment and try to establish the foundation for doing so with Dr. Viechnicki.[5] Following this exchange, the trial court or-

---

5. N.T. volume 1, Aug. 8, 2005 at 142.

dered a brief recess wherein counsel for both parties were to discuss plaintiffs' proposed use for the texts, and whether any issues would arise from their usage.

Following the recess, the following exchange took place:

"The Court: Can you proceed with the doctor without the book for today, Miss Fullam, or are you organized in such a way that you were planning to do it right from early on?

"Ms. Fullam: I should have been prepared with an answer to that, and I'm not. Let's see.

"The Court: We'll give you a minute.

"Ms. Fullam: Well, there's one that I was going to use fairly early on, your honor, that's the American College Obstetricians/Gynecologists have a preprinted, prenatal office chart form for use by its members that contains field movement counts and tracking, and is far more extensive than what Dr. Viechnicki used. His testimony at deposition was that he doesn't track fetal movement.

"The Court: All right. Well, we'll bring the jury in for the opening statement, and then we'll break to address this issue.

"Ms. Fullam: I'm not sure that is learned treatise, but that is the first thing I was going to use." (Trial Tr. vol. 1, 144:10 through 145:8.)

"The Court: Anything further you want to say on it? So you propose to ask him if he's familiar with the text?

"Ms. Fullam: Yes, your honor.

"The Court: And then ask him what?

"Ms. Fullam: Whether it's a recognized, you know, textbook in the field by physicians in his specialty.

"The Court: And then ask him what?

"Ms. Fullam: Then—well, at that point, your honor, I believe that the offer of proof is sufficient if, in fact, the text itself is recognized as an authoritative standard text in the field by physicians in his specialty.

"The Court: Well, then what would you ask him, assuming he would say yes to both questions?

"Ms. Fullam: There are some specific references within the texts, your honor, to the course of pregnancy. The circumstances and surveillance via ultrasound or non-stress testing.

"That's with respect to the *Williams Obstetrics* text, which in his deposition, he acknowledges he uses this as a reference work in his office. The other text I have here is—

"The Court: I didn't ask what the texts were. I just wanted to know how you were going to go along. Then you were going to read him passages from that?

"Ms. Fullam: I was going to ask if he would agree with certain propositions that are contained within the text, yes, your honor, as to the form that's promulgated, the prenatal office chart form that ACOG, you know, sells to its members and makes available to track prenatal care. I think that is—sort of is in a slightly different category." (Trial Tr. vol. 1, 167:9 through 168:24.)

"The Court: So what part of Miss Fullam's proposed questioning do you agree with and which part do you disagree with?

"Mr. Hill: I disagree with all of it, your honor, because I think it all comes in as substantive testimony as opposed to being offer to impeach him." (Trial Tr. vol. 1, 170:11 through 170:17.)

The court ruled as follows:

"The Court: That's the holding in *Burton v. Lister*—*Burton-Lister;* and, therefore, in this case, there will be no reading from the text or other treatises or documents.

"The doctor may be asked if he is familiar with them. He may be asked if they are—if he considers them to be authoritative, and that will be the extent to which he can be questioned on treatises." (Trial Tr. vol. 1, 173:12 through 173:20.)

Plaintiffs' counsel contends that the ruling was an abuse of discretion, because it was an improper limitation of her right to cross-examine the defendant.

The controlling case on this issue is *Burton-Lister v. Siegel, Sivitz and Lebed Associates,* 798 A.2d 231 (Pa. Super. 2002). Plaintiffs' counsel has not offered any case law that has since modified the holding in *Burton-Lister.*

Plaintiffs' counsel proposed the exact procedure which was ruled as improper in *Burton-Lister.* Physician-defendants in *Burton-Lister* were cross-examined with publications that were not established as authoritative, but instead as "standard works in the field."

The Superior Court held:

"[T]he material in question was used in cross-examination of a party, not an expert witness. Moreover, those parts of the text which reinforced appellees' theory of negligence were read into the record, offering, despite the ostensible purpose of the process, an implicit invitation to the jury to view the substance of the material as true. As the appellate courts of this Commonwealth have consistently noted, 'learned writings which are offered to prove the truth of the matters therein are hearsay and may not properly be admitted into evidence for consid-

eration by the jury.' *Majdic v. Cincinnati Machine Co.,* 370 Pa. Super. 611, 621, 537 A.2d 334, 339 (1988) (en banc)." *Burton-Lister,* 798 A.2d at 239.

In the case at hand, plaintiffs' counsel wanted to read into the record excerpts that would reinforce plaintiffs' theory of negligence. Doing so would run the risk of causing the jury to believe that the material in the texts was the appropriate standard of care to be followed by defendant. Unless the authors of the various texts were called as witnesses, the contents of the books are hearsay that could not be admitted as evidence to the jury to establish the truth of the matter asserted.[6]

Plaintiffs' counsel assigns the same error with regard to the cross-examination of defendant's expert witnesses. She includes as error a passage from page 401.

"By Ms. Fullam:

"Q: . . . Did that meet the standard of care?

"A: No, ma'am.

"Q: And on what do you base that?

"A: I've not seen typically, ever I think, a prenatal form that didn't have a notation for fetal movement. The form that my plumber's union of the American College of OB/GYN—

"Mr. Hill: Objection, your honor.

"The Court: The objection is sustained." (Trial Tr. vol. 2, 401:1 through 401:11.)

The cited passages are not cross-examination, but rather, direct examination of the plaintiffs' expert wit-

---

6. N.T. volume 1, Aug. 8, 2005 at 174.

ness, and the reasons for our ruling do not fall within the ambit of her post-trial motion. Likewise, pp. 494-495, as cited by the plaintiffs' counsel, are a recitation of the exhibits the plaintiffs offered into evidence on their side of the case and contain no rulings.

Although plaintiffs' counsel claims that she was limited in her use of authoritative texts in cross-examination of the defendant's experts, this is simply not so.

"Ms. Fullam: The only other thing that I would give your honor sort of a heads up on, and it arises in part from a comment your honor made in the record yesterday regarding the use of medical literature. I intend to use medical literature in cross-examination of the two defense experts today. And I'm not certain what the court's ruling will be regarding that. If perhaps the original ruling extends to that, I understood that it did, but—but in the event it does not, then I wanted to raise that with your honor out of the presence of the jury.

"The Court: No, the *Jistarri* case was about a witness—I mean a litigant. And so the rule is a little bit more expansive when it comes to expert testimony, and so we will be a little bit more expansive in our rulings.

"But I can't—other than that, I'm just—I'll be just as surprised as you will be, Ms. Fullam, when I make the ruling. It will depend on the question that is asked and the way in which it is approached.

"Ms. Fullam: I just really want to make sure I didn't inadvertently trespass on your honor's direction.

"The Court: No, I think to cross-examine an expert, I think that the law definitely embraces the concept that use of learned treatises is in some limited respect fair game.

"What we always must be conscious of is that everything that is in the so-called learned treatise really is hearsay.

"Ms. Fullam: I recognize that, and it's for impeachment purposes absent an admission on the part of the witness.

"The Court: Right. Okay. Any other issues for this morning?" (Trial Tr. vol. 4, 725:23 through 727:9.)

We sustained an objection to the use of learned writings during plaintiffs' cross-examination of Dr. Frank Manning, an expert witness for the defense. We permitted plaintiffs' counsel wide latitude to impeach the witness' testimony with his own writings. When plaintiffs' counsel went further to attempt impeachment of the witness' writings rather than impeachment of his testimony, she was cautioned not to do so.

"Mr. Hill: Your honor, if—

"The Court: Not out of any other books, ma'am." (Trial Tr. vol. 4, 904:7 through 904:9.)

The following exchange then took place:

"By Ms. Fullam:

"Q: You were referring to a table—I take it the tables in your book were drawn from another author?

"A: Some of them from published—yeah, they're from published research, not from textbooks.

"Q: Are there—are you familiar with the *Williams Obstetrics* text?

"A: Yes, I am.

"Q: And does it draw upon—does it employ tables of the kind you're searching for now?

"A: I do not recall.

"Q: Would you like me to show you the one that they have at page 847, and you can take a look and see if you consider it to be reputable?

"Mr. Hill: Your honor, I object.

"The Court: The objection is sustained. We have given you wide latitude, Ms. Fullam, to cross-examine him with his own writings. We—it is now clearly outside the scope of the examination, and we are going to sustain the objection." (Trial Tr. vol. 4, 904:10 through 905:6.)

In that instance, we sustained the objection because the question was clearly outside the scope of direct examination.

Later in Dr. Manning's examination, we did not permit the use of the *Williams'* text because the witness was on re-cross, and the area of inquiry was outside the scope of his redirect examination.

When plaintiffs' counsel properly attempted to use learned treatises, we permitted her to do so.

"Ms. Fullam: Well, your honor, I would like to make a record that I would like to use the growth chart, the tenth percentile issue from the *Williams Obstetrics* text to impeach this witness. He has testified to what the number was—

"The Court: Right, I think that would be fair.

"Ms. Fullam: All right." (Trial Tr. vol. 4, 947:3 through 947:10.)

When plaintiffs' counsel properly attempted the use of learned writings, we permitted it. When Ms. Fullam cross-examined Dr. Glazerman, an expert witness for the defendant, she was given wide latitude.

"By Ms. Fullam:

"Q: Dr. Glazerman, I'll try to make this as focused as I can. You ended, I think with a statement about fetal growth restriction and that she was not a growth restricted baby, and you quoted some numbers. You refer to the *Williams* text as part of your practice, don't you?

"A: I'm familiar with *Williams,* yes.

"Q: And you look to it as a reference, don't you?

"A: On occasion, along with numerous other references.

"Q: And they publish a—let me show this to you. For the record, we're looking at chapter 36 on fetal growth restriction, page 841 table 36 dash 1.

"A: Okay.

"Q: Okay. Now, this includes the—based on the—this is a population survey of 3,134,879—

"The Court: Excuse me. There's some preliminary questions you need to ask him first.

"By Ms. Fullam:

"Q: Are you familiar with growth charts of this kind?

"The Court: I believe that you have to establish acceptance of the treatise first of all.

"Ms. Fullam: Thank you.

"By Ms. Fullam:

"Q: This is a standard reference work in your field, is it not, the *Williams Obstetrics* text?

"A: It's a reference work that is in the field, yes.

"Q: And you own a copy in your library?

"A: Yes, I do.

"Q: And you, I imagine, buy them as they come out or at least periodically with updates?

"A: I don't necessarily buy every new edition, but I do buy them.

"Q: And if you were looking for precision in terms of just a reference on facts such as this, the reports on the surveys of gestational weight for age based on surveys of millions of babies born in the United States, this would be the kind of reference you look at, wouldn't it?

"A: It may be one of several references that I look for, yes.

"Q: And drawing your attention to page 841, is there a survey there—

"Mr. Hill: Your honor, objection. I don't think it's—

"The Court: Well, the magic words haven't been used, but we'll accept it.

"By Ms. Fullam:

"Q: Doctor, can I draw your attention here to the table? And can you tell the jury what sort of—what data they drew on in putting this table together?

"A: All I can say is that this was birth weight for gestational age based on over three million single live births.

"Q: In the United States?

"A: In the United States.

"Q: So we excluded Canadians for purposes of this table; is that correct?

"A: I guess we did.

"Q: And this was drawn from 1996 data?

"A: Yes, it was.

"Q: So this is not 35 years old? This is not from the 1960s?

"A: I don't know when the data was drawn.

"Q: Okay.

"A: This was published in 1996. It very well may be 30-year-old data from all I know.

"Q: That's fair. And what is the cutoff for the tenth percentile of a baby at 40 weeks and at 39 weeks just—since she was in between? What are the numbers?

"A: On this table, 40 weeks is 2,761 grams—I'm sorry, tenth percentile, I apologize was 2,929 grams, and 39 weeks is 2,852 grams.

"Q: So the 10 percent figure, whether she's 39 weeks or 40 weeks, and she was somewhere in between, are both numbers that are higher than her birth weight, aren't they?

"A: Yes, they are.

"Q: And, in fact, if she was 40 weeks, she actually would qualify really around the five percentile cutoff, wouldn't she?

"A: According to this chart, sure.

"Q: Okay. And that's based on 3,134,879 single live births in the United States of America.

"A: Yes, it is.

"Q: So if one were to accept that range of sample as an accurate basis for determining the numbers, she was less than 10 percentile, she might have been fifth percentile?

"A: If one were to accept that as an accurate basis, yes, but there are numerous determinations very similar to that and the consensus is that the tenth percentile at term is approximately 2,500 grams." (Trial Tr. vol. 4, 949:1 through 953:3.)

We also permitted plaintiffs' counsel to cross-examine defendant's expert Dr. Glazerman as follows:

"By Ms. Fullam:

"Q: Doctor, do you refer to the *Gabbe* text at all in your office?

"A: On occasion.

"Q: What is an algorithm?

"The Court: No, not yet. You have to ask him if he considers it to be authoritative.

"Ms. Fullam: I haven't quite gotten there yet, your honor, but I'll move on to that.

"By Ms. Fullam:

"Q: Do you consider the *Gabbe Obstetrics* text to be a standard text in your field?

"A: It's a well-known text in the field, yes.

"Q: And is it used to treat future obstetrician/gynecologists? And is it referenced by a board certified obstetrician/gynecologist in the United States?

"A: I can't comment on what any other doctor does other than myself.

"Q: And you personally use this as a reference work?

"A: I have occasionally referenced that as well as numerous other texts, yes.

"Q: And going back to my earlier question, what is an—

"Mr. Hill: Objection, your honor.

"The Court: The objection is overruled. You can proceed.

"By Ms. Fullam:

"Q: What is an algorithm?

"A: An algorithm is a series of steps in a step-wise fashion that is designed to determine a process. That's the best way I can define it.

"Q: All right. Let me approach you and show you one such algorithm at page 335 under antepartum fetal evaluation. Do you see this, Doctor?

"A: I do.

"Q: All right. Do you want to take the time to look at it?

"A: I see that.

"Q: And is that an algorithm for a response on fetal activity?

"A: Yes, it is.

"Q: And can you tell the jury whether you agree with that algorithm?

"A: Well, what this says—

"Ms. Fullam: Your honor, with the court's permission, can I put this up?

"The Court: Not yet. It's not introduced into evidence.

"By Ms. Fullam:

"Q: Go ahead.

"A: What this says is that fetal activity, if it's adequate, continuing monitoring. If it's decreased, a non-stress test.

"Q: And do you agree with that?

"A: I agree that if fetal activity is felt to have a clinically significant decrease, that further testing is appropriate." (Trial Tr. vol. 4, 971:1 through 973:11.)

## *"Pre-Screening" of Impeachment Materials*

Plaintiffs' counsel next alleges that it was an abuse of discretion for the trial court to make inquiry into how plaintiffs' counsel intended to use certain texts as impeachment materials during cross-examination of defendant. With respect to this issue, the following exchange occurred at trial:

"Mr. Hill: I believe that Miss Fullam is going to be using some textbooks with Dr. Viechnicki's cross-examination, and I guess we'll wait to see what happens at that time of cross-examination.

"The Court: Well, are you asking for an offer of proof?

"Mr. Hill: I guess offer of proof as to the textbooks, your honor, because I'm not aware that the doctor indicated he found anything authoritative.

"The Court: Are you going to be using textbooks?

"Ms. Fullam: Your honor, I have certain material I intend to try to use in impeachment and try to establish the foundation for doing so with Dr. Viechnicki.

"The Court: All right. Well, suppose during this break you go over them with Mr. Hill so that we can see if they're [sic] going to be any issues.

"Ms. Fullam: Your honor, with all due respect, I don't believe that I'm required to prescreen impeachment material with defense counsel, so these are matters which I would like to raise directly with the doctor for the first time.

"The Court: Miss Fullam, I don't believe in trial by ambush, and I'm not going to hold up the jury and have a lot of side-bar rulings while we struggle over those. And I've given you an instruction, and with all due respect, I expect it to be followed. We're in recess.

"(Whereupon, a recess was taken.)

"The Court: All right. Are there any issues before we bring in the jury?

"Mr. Hill: Yes, your honor, during the break, Miss Fullam showed me what she would be using for cross-examination of Dr. Viechnicki when he took the stand, and the majority of it were, I guess you could say, learned treatises, ACOG guidelines, that type of thing, and I would think that, your honor, the way she's going to approach Dr. Viechnicki with these numerous books or textbooks would be improper use of a learned treatise in light of the fact that as far as discovery has been produced so far in this case that Dr. Viechnicki has indicated that he may have one or two of these—I think just one of these textbooks in his office, but I don't think there's been any that the doctor finds them to be authoritative or he finds them to be referenced with other professionals in his profession would rely upon them." (Trial Tr. vol. 1, 142:3 through 144:5.)

Plaintiffs' counsel argues that it was improper for the trial court to force plaintiffs' counsel to "tip its hand"[7] with respect to how it planned to impeach the defendant.

The conduct of a trial is within the discretion of the trial judge. The court did not direct plaintiffs' counsel to "pre-screen" anything. The term is plaintiffs' counsel's term, and is inaccurate. We directed counsel to go over the proposed matters with each other "so that we can see if they're [sic] going to be any issues." In order that the issue could be clearly presented to the court prior to the

---

7. Brief of plaintiffs in support of the motion for post-trial relief at 16.

court's ruling. The court was not requiring counsel to obtain the permission of opposing counsel, but merely to refine the issues for the court in the event that agreement could not be reached.

Throughout the trial, the record is replete with reminders from the court to counsel to discuss all evidentiary issues with each other first. The value of such a directive should be self-evident. Many issues can be resolved by the agreement of counsel, and the time of the court and the jury need not be taken with argument and ruling on issues where there is agreement. The court did not direct counsel to such conferences with each other only in the instance of the cross-examination of Dr. Viechnicki.

Finally, and most importantly, plaintiffs' counsel's complaint about being required to "pre-screen" her line of questioning is limited only to the court's requirement that she discuss the use of learned treatises with opposing counsel. Because we ultimately precluded this line of questioning, having to reveal these learned treatises did not result in any prejudice to the plaintiffs.

Accordingly, plaintiffs' motion for post-trial relief based on the improper "pre-screening" of the learned treatises is denied.

### Limitation of Impeachment of Doctors Glazerman and Viechnicki

Plaintiffs' counsel next argues that the trial court erred in sustaining the defendant's objection to questions of defendant's expert witness, Dr. Glazerman, concerning his own personal practice. Specifically, plaintiffs' counsel wanted to ask Dr. Glazerman whether he had recently ordered a non-stress test when one of his own patients

complained of reduced fetal movement. At trial, the exchange on cross-examination of Dr. Glazerman went as follows:

"Q: Let me show you something in small form first.

"Mr. Hill: Offer of proof, your honor. It looks like this could be a document of some sort.

"Ms. Fullam: Let me show it to the doctor first.

"Witness: Yes, I see that.

"By Ms. Fullam:

"Q: All right. Is this your prenatal record form, Doctor?

"A: Yes, it is.

"Q: And are you listed as the provider, Dr. Larry Glazerman?

"A: Yes, I am.

"Q: And it's a prenatal record?

"A: Yes, it is.

"Q: Does this reflect the manner of charting that you employee [sic] in your practice for tracking pregnancies?

"A: Yes, it does.

"Q: How many pages long is it?

"A: Nine.

"Q: Why do you have so much information?

"A: I—I'm a computer geek, self-styled sort of, and I choose to use a computerized prenatal record, and that's the information my personal prenatal record gives me.

"Ms. Fullam: And your honor, with the court's permission, may I show just an enlargement of this to the jury? The patient identifiable information has been re-

dacted, and I have a letter of permission to use it in a redacted form.

"Mr. Hill: I would like to know what the relevance is—

"The Court: The objection is sustained. This is not relevant.

"By Ms. Fullam:

"Q: Doctor, what kinds of information do you make a point to document in your own office chart?

"A: Me, myself, or—

"Q: Yeah.

"A: Generally what I document is fetal heart tones, fetal movement, the presentation, the fundal height, the next visit, and any comments.

"Q: And, Doctor, what is your practice when a patient complains to you that the movement is slightly less than she expected in the third trimester?

"Mr. Hill: Objection, your honor.

"The Court: The objection is sustained.

"By Ms. Fullam:

"Q: Doctor, isn't it true that part of your own practice, when a patient complains that the fetal movement is slightly less than she expected, that you get a non-stress test?

"Mr. Hill: Objection, your honor.

"The Court: The objection is sustained, and I will explain my ruling so that we don't waste anymore time on it. To some degree, we permitted you some latitude in this to ask this witness about his own practice; but, in fact, he is here as—the standard of care is not something

to be proved by individual practices, and it really isn't relevant.

"Q: Doctor, do you adhere to the standard of care that you are testifying to in your own delivery of obstetric services to patients?

"A: I hope I do. I'd like to think that I do, yes.

"Q: And do your treatment records reflect the fact that you are adhering to the standard of care applicable to you under the circumstances—

"Mr. Hill: Objection.

"The Court: Don't do this anymore, Ms. Fullam. I thought I explained it to you. If you need further explanation, perhaps we ought to do it at side-bar. Do you need further explanation?

"Ms. Fullam: Certainly, your honor. . . .

"(Whereupon, the following discussion took place at side-bar.)

"The Court: What the Doctor does individually is not relevant.

"Ms. Fullam: Your honor, I'm attempting impeachment. He has said there is no indication with a report of a decrease to do anything. I am here with a record from the same general time period in which it was computerized unambiguous, authenticated by him where the patient complained of slightly less movement than she expected. He got a non-stress test. He had her come back. There was still decreased movement. He got another non-stress test. Both tests were reactive and he, nevertheless, scheduled the patient for an early induction. That's impeachment material with respect to his testimony.

"The Court: You're impeaching him on something that was already irrelevant, and we simply permitted you to do it because there was no objection from counsel, and I wasn't going to intervene. But the problem is you asked an irrelevant question and you—now you want to impeach him with particulars, and I have said you can't do it.

"Ms. Fullam: We'll mark the record for purposes of the record at a later time. We don't need to hold the jury to do that, your honor.

"The Court: You can hold the jury as much as you want, you know, it's your witness. Okay. Do what you want to do. But don't ask those questions.

"(Whereupon, the discussion at side-bar was concluded.)" (Trial Tr. vol. 4, 966:1 through 970:24.)

Plaintiffs' counsel argues that the case of *Boucher v. Pennsylvania Hospital,* 831 A.2d 623 (Pa. Super. 2003), stands for the proposition that the scope for cross-examination of a medical expert is very broad, allowing for the admission of expert medical testimony when such testimony directly and unequivocally contradicted the expert's own testimony as to the standard of care. The language in *Boucher* on which plaintiff relies reads:

"Generally, '[e]very circumstance relating to the direct testimony of an adverse witness or relating to anything within his or her knowledge is a proper subject for cross-examination, including any matter which might qualify or diminish the impact of direct examination.' *Kemp v. Qualls,* 326 Pa. Super. 319, 324, 473 A.2d 1369, 1371 (1984). Specifically regarding medical experts, the 'scope of cross-examination involving a medical expert includes reports or records which have not been admit-

ted into evidence but which tend to refute that expert's assertion.' *Collins v. Cooper,* 746 A.2d 615, 618 (Pa. Super. 2000)." *Boucher,* 831 A.2d at 629 (Pa. Super. 2003).

In *Boucher,* the Superior Court allowed the use of records and reports not in the record to refute the testimony of an expert medical witness about the existence of such reports in forming his opinion.

*Boucher* stands for the limited proposition that:

"Where an expert report is disclosed to another expert and reviewed by that expert, and then by his testimony the expert mischaracterizes that report, either explicitly or by implication, . . . basic fairness and the entitlements of cross-examination permit the disclosure of that report to the degree necessary to expose the mischaracterization by the testifying expert." *Id.* at 632.

It is not suggested here that Dr. Glazerman mischaracterized any reports upon which he based his expert medical opinion. Accordingly, *Boucher* is inapplicable to this situation.

Plaintiffs' counsel's line of questioning about how Dr. Glazerman recently handled a patient with complaints similar to those of Jessica Craddock was improper for several reasons. First, it is irrelevant. Plaintiffs' counsel does not cite any case law which holds that specific instances of an expert witness' medical decisions or practice are probative of a standard of care, particularly where those practices exceed the standard of care to which he testifies.

Second, it is irrelevant because the patients themselves were not identical. Plaintiffs' experts testified that the standard of care required non-stress testing upon the par-

ticular facts in Mrs. Craddock's situation, not every report of decreased fetal movement.

Plaintiffs' counsel also cites the rationale of *Boucher* to argue that Dr. Viechnicki had testified inconsistently, claiming that Dr. Viechnicki testified that he never received Dr. Sarno's December 6, 2001 expert report, and that as a result, the inadmissible expert report of Dr. Sarno should have been admitted to impeach Dr. Viechnicki.

At trial, plaintiffs' counsel attempted to impeach defendant with the following line of questioning regarding the causation of Madison Craddock's demise:

"By Ms Fullam:

"Q: Did you do any testing of any kind yourself?

"A: No.

"Q: Did you take it upon yourself to learn the results of testing done by others?

"A: I have a letter from September. It was the only information.

"Q: You're not saying that's the only information you've ever got?

"A: That's the only information I've ever received." (Trial Tr. vol. 2, 331:9 through 331:19.)

The trial court did not allow plaintiffs' counsel to delve any further into whether or not defendant received Dr. Sarno's December 6, 2001 report. Plaintiffs' counsel argues that Dr. Viechnicki asserted at deposition that he received Dr. Sarno's December 6, 2001 report. Plaintiffs' counsel argues that she should have been allowed to then question Dr. Viechnicki about Dr. Sarno's December expert report pursuant to *Boucher,* because Dr. Viechnicki

had testified inconsistently with respect to Dr. Sarno's expert report.

This argument amounts to nothing more than plaintiffs' attempt to circumvent our ruling denying the admission of Dr. Sarno's expert report. First, Dr. Viechnicki was not testifying as an expert witness, as is necessary for the application of impeachment ruling in *Boucher*. The language of *Boucher* states, "where an expert report is disclosed to another expert and reviewed by that expert, and then by his testimony the expert mischaracterizes that report . . . ."

Here, Dr. Viechnicki was not testifying as an expert witness, and therefore, the principle set forth in that case does not apply. Secondly, *Boucher* will not allow impeachment of Dr. Viechnicki based on his testimony that he did not receive the report because such testimony does not mischaracterize the contents of Dr. Sarno's report. In *Boucher*, the expert witness mischaracterized the contents of a report upon which he was basing his own opinion by stating that there was no mention of cephalohematoma in the report when in fact there was. Here, there was never a contention that Dr. Viechnicki lied about the contents of the Dr. Sarno expert report.

Accordingly, plaintiffs' motion for a new trial on these grounds is also denied.

## *Dr. Viechnicki's Records*

Plaintiffs' counsel next argues that the trial court abused its discretion because plaintiffs' counsel was not allowed to submit into evidence the original records of the defendant relating to his treatment of Jessica Craddock.

On the fourth day of trial, plaintiffs' counsel raised the following issue outside the hearing of the jury:

"Ms. Fullam: I think there are two issues, your honor, that I'd like to bring up. Number one, I need to recall Dr. Viechnicki very briefly in my case in chief. It will take less than 10 minutes, and I will take it out of the time that I suggested to your honor I would be using with other witnesses. There was something important that I neglected to cover with him.

"The Court: Any objection, Mr. Hill?

"Mr. Hill: Your honor, I'm going to be calling him in my case in chief.

"Ms. Fullam: I can't be confident of that, your honor, and it's part of my case. Really, there is—

"The Court: Well, Mr. Hill, are you going to be making any dispositive motions at the conclusion of plaintiffs' case?

"Mr. Hill: Yes, your honor, I will be.

"The Court: Well, then she's entitled to call him.

"Mr. Hill: I have to protect the record.

"The Court: I understand that. But what issue do you need to call him on?

"Ms. Fullam: I'd rather not say in open court, your honor. I'd be happy to make—to present to your honor—

"The Court: No.

"Ms. Fullam: There's an issue with respect to the doctor's records.

"The Court: And why is that necessary to make out the elements of your case? I mean at this point—

"Ms. Fullam: Your honor, if I can approach at sidebar?

"The Court: No.

"Ms. Fullam: Your honor, I can't reveal this in front of Dr. Viechnicki. He's here in the courtroom. That is why I am asking to approach and tell your honor—

"The Court: I just asked you what element—what element of negligence does this go to?

"Ms. Fullam: It goes to his negligence in the prenatal care expressly, your honor.

"The Court: Well, that's really pinning it down. I don't see any need—I'll tell you what, no, you're not going to recall him unless at the conclusion of your case I feel that there's some element that you haven't made out that's going to make you fail on a dispositive motion.

"Ms. Fullam: Can I state that I feel strongly that as an officer of the court I have an obligation to bring the matter, which I would like 10 minutes of time to do, to the court's attention and to make it of record?

"The Court: Yes, well, you have brought it to my attention. You've asked to put him on. And I have said, no, you can't because I don't see where it's necessary to bring him on as of cross to make out a case that will survive a motion. End of story. It's done. Okay. You've made your record. And I have said, no, you can't. You're going to win your dispositive motion. What's the point except for trial tactics?

"Ms. Fullam: I'd be happy to tell your honor at side-bar, more than pleased.

"The Court: It doesn't matter. It's not—it is not legally necessary.

"Ms. Fullam: I can assure your honor that it is, and I'm prepared to make a record at side-bar.

"The Court: If you're asking to make a record, we'll permit you to make a record.

"Ms. Fullam: Thank you, your honor. . . .

"(Whereupon, the following discussion took place at side-bar.)

"The Court: But I don't know how we do this and you're asking defense lawyer not to go and tell his client. Is that what you're saying?

"Ms. Fullam: I have to take that risk given this, your honor, I have to. I have an obligation. I assure you.

"The Court: All right. I think—

"Ms. Fullam: I have an obligation.

"The Court: All right. Go ahead. Go ahead.

"Ms. Fullam: I'm sorry, your honor. I'm tired and I apologize if I'm coming across as too intense. Dr. Viechnicki altered his medical records and committed perjury in the examination he did so far. The prenatal office record that was directed by his office to St. Luke's Hospital does not contain the fetal height measurement, which he has in his office record. It has been the basis of his defense of the case is that she returned to normal values. That normal value is not recorded in the prenatal record which St. Luke's Hospital has. And, therefore, he committed fraud. The predicate for the defense and for his demeanor on cross was that those were authentic values that he recorded at the time that were the basis for the assurance that, in fact, the fundal height measurements had returned to precisely where they should be.

"The Court: And why does this have to be brought out on the plaintiffs' side of the case?

"Ms. Fullam: Because, your honor, number one, I have an obligation because I've moved the admission of these records as if they are authentic; and, in fact, I have now determined that they are not. I have a record where there is perjury in the record, and I have an obligation to correct it.

"The Court: Well, I'll give you a chance to correct it when the defendant takes the stand.

"Ms. Fullam: Can I ask that defense counsel not reveal this to his client, your honor?

"The Court: No, you can't. He has a duty to his client. Ms. Fullam, I did everything I could to keep this from happening, but you—you had to—you felt you had to put this on the record. And it's on the record. He has an obligation to his client.

"Ms. Fullam: Does your honor understand that I have an obligation to your honor and to the court with respect to this matter?

"The Court: We understand that you think you thought this was your obligation.

"Ms. Fullam: Okay.

"Mr. Hill: Your honor, if I may, when Dr. Viechnicki was deposed, Attorney Fullam accused him of fudging his records, and I filed a motion in limine which was granted by your honor.

"The Court: Well, it just depends what comes out on cross-examination of your client. I mean it's—it's certainly an issue that if—that definitely has to be explored. But in order to make out—the only reason to call somebody as of cross-examination, is to establish necessary elements in order to survive a nonsuit. That's been done." (Trial Tr. vol. 4, 713:7 through 719:9.)

Once the defendant took the stand on his side of the case, and during cross-examination,[8] plaintiffs' counsel attempted to enter the original copy of Dr. Viechnicki's records into the record as follows:

"Ms. Fullam: Your honor, then I would ask that the doctor's original chart be made part of the evidentiary record rather than the Xeroxed copy.

"The Court: No, the objection is sustained. There have been other rulings that would affect that, and I will be happy to discuss it with the attorneys later. That is enough. You have no expert to address these issues, Ms. Fullam. And we're not going to have a jury speculating or you speculating any further." (Trial Tr. vol. 5, 1063:24 through 1064:9.)

It should first be noted that defendant's counsel filed a motion in limine on September 27, 2004, seeking to preclude plaintiff from offering evidence suggesting that Doctor Viechnicki had altered his records. Plaintiffs' counsel did not respond to the motion, and we granted the motion in limine.[9] This all occurred about 10 months before the trial commenced.

Because we had ruled on the same issue some 10 months before, plaintiffs' counsel's claims that she had

8. See *e.g.,* N.T. volume 5, Aug. 12, 2005 at 1062-63.

9. The November 18, 2004 order states:

"And now, November 18, 2004, upon consideration of the motion in limine of defendants, M. Bruce Viechnicki M.D. and M. Bruce Viechnicki M.D. & Associates P.C., to preclude any evidence that Dr. Viechnicki altered records, it is hereby ordered and decreed that said motion is granted.

"It is further ordered and decreed that plaintiffs shall be precluded from offering to the jury any evidence concerning or relating to plaintiffs' assertions that Dr. Viechnicki altered his medical records."

"just discovered" the suspected alteration by Dr. Viechnicki did not impress the court as being particularly candid.

Nonetheless, we allowed plaintiffs' counsel considerable latitude in questioning the defendant about the veracity of his records, and a plausible explanation was provided to the jury, that records were forwarded to the hospital some weeks prior to the anticipated date of delivery, and the records, of necessity, would not contain information from visits that occurred subsequent to the records being sent to the hospital.

Not only did plaintiffs' counsel question the veracity of defendant's records months earlier, but despite having ample time to hire a document forensic expert to testify, plaintiffs' counsel did nothing. Plaintiffs' counsel proposed no expert testimony as to the alleged falsification of the records. No facts were offered at trial to support plaintiffs' counsel's assertion that the document was altered. Plaintiffs' counsel merely sought to inflame the jury and to ask the jury to speculate as to whether the records were falsified.

The proposed evidence was speculative, contrary to earlier order of court, and inflammatory. Accordingly, plaintiffs' counsel's motion for post-trial relief based on the trial court's refusal to admit into evidence Dr. Viechnicki's records is hereby denied.

### Dr. Viechnicki's Alleged Intoxication

Plaintiffs' counsel argues that the trial court abused its discretion when it precluded plaintiffs from introducing evidence to the jury that Dr. Viechnicki was under the influence of alcohol at the time he was present at St.

Luke's Hospital on September 10, 2001. In response to a motion in limine filed by defendant on September 27, 2004, and after argument, the trial court issued an order on November 18, 2004, precluding plaintiffs' counsel from asking any questions regarding Dr. Viechnicki's alleged intoxication.

In the motion for post-trial relief, plaintiffs' counsel argues that the court should have admitted into evidence testimony from Jessica Craddock's aunt and uncle, Joyce and Robert Mohring. In deposition, Robert Mohring testified that he smelled whiskey on Dr. Viechnicki's breath while at St. Luke's Hospital on September 10, 2001. Also in deposition, Jessica Craddock's aunt, Joyce Mohring, testified although her sense of smell was impaired due to illness, she noticed that "there was something obviously wrong with [Dr. Viechnicki]."

The proffered testimony was deficient on many levels. The mere odor of alcohol is insufficient to permit a jury to conclude that a person is under the influence of alcohol.

"[T]he well-settled law of this Commonwealth is that where recklessness or carelessness is at issue, proof of intoxication is at issue, proof of intoxication is relevant, but the mere fact of consuming alcohol is inadmissible as unfairly prejudicial, unless it reasonably establishes intoxication." *Locke v. Claypool,* 426 Pa. Super. 528, 627 A.2d 801 (1993).

The additional information "there was something obviously wrong with the doctor" did not contribute the type or quality of information which is necessary to permit a jury to infer that the doctor was under the influence of alcohol.

Next, the proffered testimony is highly inflammatory.

Finally, plaintiffs' case concerning negligence was based on the alleged failure of Dr. Viechnicki to order adequate testing PRIOR to delivery in the light of slow fundal height development, low estriol levels and decreased fetal movement. The last of these events occurred on September 6, 2001. Defendant's supposed intoxication is alleged to have been observed days later, on September 10, 2001. Clearly, such testimony was not being offered to prove defendant's negligence as any negligent behavior would have occurred days or months earlier, but rather, was being asserted to prejudice the jury against the defendant. Plaintiffs' counsel's motion for post-trial relief based on the preclusion of evidence of Dr. Viechnicki's "intoxication" on September 10, 2001, is denied.

### Post-Trauma Drug and Alcohol Abuse

Plaintiffs' counsel next argues that the trial court abused its discretion when it denied plaintiffs' motion in limine of August 30, 2004, which sought to exclude testimony regarding Jessica Craddock's drug and alcohol abuse following the loss of Madison Craddock. Plaintiffs' counsel argues that such evidence is prejudicial and should have been excluded.

At trial, the following testimony regarding Jessica Craddock's drug abuse was elicited from Dr. Edward Norris, Jessica Craddock's own treating mental health physician:

"Mr. Hill: Since you're managing the medication, did—I don't know, does the marijuana somehow affect the efficacy, the effectiveness of the medication you're prescribing?

"Dr. Norris: Sure, and when she told me that she was smoking one time per week for relief of her depression, she was not responding to her antidepressants at that time. I told her that she needed to stop smoking marijuana and that we would, you know, use medicines to treat her depression." (Trial Tr. vol. 3, 636:23 through 637:7.)

In support of its argument, plaintiff cited *Commonwealth v. Satzberg,* 358 Pa. Super. 39, 516 A.2d 758 (1986). In *Satzberg,* a new trial was ordered following a district attorney's in-court reference to a defendant's drug habit. The drug use was unrelated to the crime for which the defendant was under prosecution. From this, plaintiffs' counsel argues that because criminal cases do not allow evidence of unrelated drug use, civil cases should not as well.

In the case at bar, the plaintiffs were seeking damages founded, inter alia, on allegations of damages to the mental health of Jessica Craddock caused by the stillbirth of her daughter. The degree to which the plaintiff impaired her subsequent mental health recovery by the use of marijuana is highly relevant to the issue of damages. The jury should have been allowed to hear evidence tending to show that the plaintiff acted to exacerbate the claimed damages, by taking drugs and alcohol that negatively impacted the effectiveness of post-traumatic treatment.

The probative value of this evidence outweighed its prejudicial nature.

Accordingly, plaintiffs' motion for post-trial relief with respect to the testimony of Jessica Craddock's drug use is denied.

## ISSUES INVOLVING THE JURY

### *Jury Instructions*

Plaintiffs' counsel next alleges that a new trial is necessary because the trial court gave erroneous jury instructions. Specifically, plaintiffs' counsel argues that the court failed to inform the jury that there should be no contributory negligence contemplated, and that the jury should determine only the negligence of defendant.

Following the jury instructions, plaintiffs' counsel made the following statement at side-bar, which was reiterated in plaintiffs' counsel's brief in support of the motion for post-trial relief, with respect to the court's charging of the jury on negligence:

"Ms. Fullam: I presume that what we've already said doesn't need to be reiterated, so I was only going to say that in the area of negligence and carelessness, the jury was not instructed that there's no question in this care—in this case about the reasonableness of Jessica Craddock's conduct, that the sole question for them to evaluate is the reasonableness of Dr. Viechnicki's conduct. There is no contributory negligent issue here.

"The Court: I don't think I was requested to give that instruction.

"Ms. Fullam: Your honor, I did not know how you were going to—that will be asking you to do a negative, your honor. Contrib was not requested, and I'm merely noting that the manner in which your honor gave the charge on negligence, both general and specific, did not make clear that the only party whose conduct is being assessed was Dr. Viechnicki's, and that there is no ques-

tion in the case of the reasonableness of Jessica Craddock's conduct." (Trial Tr. vol. 5, 1150:12 through 1151:8.)

Plaintiffs' counsel argues that by failing to give a clarifying instruction, the court left the jury confused.

Prior to the instruction of the jury, plaintiffs' counsel never requested such an instruction. Counsel had been adequately informed by the court as to the anticipated jury instructions on negligence. Even at the point when counsel made the statement following jury instructions, she did not request such an instruction and admitted that she had not requested such an instruction, because it was difficult to request a "negative." If counsel had wished a wording different from or in addition to the standard jury instruction, she had ample opportunity to make such a request and failed to do so.

The applicable standard to be applied to review of jury instructions can be found in *Blicha v. Jacks,* 864 A.2d 1214 (Pa. Super. 2004). *Blicha* states:

"It is only when 'the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue' that error in the charge will be found to be a sufficient bases for the award of a new trial. [A] charge will be found adequate unless 'the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error.' A reviewing court will not grant a new trial on the grounds of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental." *Blicha v. Jacks,* 864 A.2d 1214, 1219 (Pa. Super. 2004).

After the presentation of evidence, it was perfectly clear that the jury was responsible for determining only the negligence of Dr. Viechnicki, and the effect of that negligence on plaintiff. The jury sat through five days of testimony, each day dealing solely with Dr. Viechnicki's deviation from the standard of care or the effects that this ordeal had on plaintiff. There was never any evidence presented that would even suggest that any other party was at all negligent in the entire case. There was simply no need to point out to the jury any specific matters that were clearly outside the evidence presented. The jury was charged to consider only the evidence presented.

In *Vallone v. Creech,* the court stated "[i]t is hornbook law in this Commonwealth that a trial court should not charge the jury on a concept that is not supported by the evidence." *Vallone v. Creech,* 820 A.2d 760, 765 (Pa. Super. 2003).

Accordingly, because it was unnecessary to give an instruction precluding the jury from considering contributory negligence on the part of the plaintiff, we committed no error. Furthermore, the jury slip approved by counsel requested the jury to make findings only about the defendant's negligence.

Plaintiffs' counsel next argues that the trial court should not have given the "mere error in judgment" instruction. It is important to clarify that the court did not give a *MERE* error in judgment charge.

Specifically, the following jury instruction was delivered by the court:

"The Court: A physician must also use the same degree of care as would a reasonable person under the

circumstances, and if he fails to do so, he is negligent. An error in judgment does not automatically subject the doctor to liability. The medical judgment of a doctor must be based on the same degree of skill, knowledge, and care as that normally exercised in the medical profession. If the physician does employ the required skill, knowledge, and care customarily exercised in the profession to make a judgment, then this would not render him liable." (Trial Tr. vol. 5, 1140:4 through 1140:16.)

In support of the argument, plaintiffs' counsel points to *Vallone v. Creech.* In *Vallone,* a doctor admitted in his testimony that he was aware after seeing a patient, that there was a 20 percent chance that the symptoms being described to him were due to a recurrence of cancer. The doctor nevertheless did no further tests. At that trial, the judge included an instruction on "mere error in judgment." The *Vallone* court stated "[i]t is hornbook law in this Commonwealth that a trial court should not charge the jury on a concept that is not supported by the evidence." *Vallone,* 820 A.2d at 765. The Superior Court concluded that the "mere error in judgment" instruction was inapplicable to the situation because it was not supported by the evidence. The court went on to explain that "given [defendant's] acknowledgment that he thought recurrence was a 20 percent possibility, his failure to order diagnostic testing was not a mere error in judgment." *Id.* at 766.

The evidence presented at trial in *Vallone* was very different than the evidence presented in this case. Specifically, nowhere in Dr. Viechnicki's testimony did he admit that he was aware of any degree of danger to the health of the baby due to the report of decreased fetal

movement. In fact, at trial, plaintiffs' medical expert testified with respect to the standard of care upon observation of reduced fetal movement:

"Dr. Manning: No, decreased fetal movement is—it's a discussion. So that—and if decreased fetal movement means absent fetal movement, absolutely, yes. But decreased fetal movement is a common finding in fetuses as they approach term. Now, it requires a discussion with the patient. You can't just simply ignore a patient saying decreased fetal movement. But with discussion, you find out, in fact, the baby is moving, but moving in a different pattern or less frequently, but the key here is if the baby is moving, then decreased fetal moves do not have any clinical significance." (Trial Tr. vol. 4, 849:2 through 849:14.)

Unlike *Vallone,* this was not simply a matter of defendant knowing that there was a risk to the baby, but nonetheless leaving it to chance as to whether the worst-case scenario actually arose. Here, the testimony indicated that the symptoms that plaintiff complained of were common at that stage in pregnancy.

The "error of judgment" instruction is designed to ensure that the "jury base[s] its verdict on whether a physician had failed to follow proper medical procedure and not to infer a breach of the standard of care merely from [the] unfortunate result." *Havasy v. Resnick,* 415 Pa. Super. 480, 501, 609 A.2d 1326, 1336 (1992); see also, *Blicha v. Jacks,* 864 A.2d 1214, 1219 (Pa. Super. 2004) (upholding jury instruction that stated, "a physician is not liable for an error of judgment. The medical judgment itself of a doctor must be based on the same degree of skill, knowledge and care as that normally exercised in the medical profession"). Accordingly, the error in

judgment standard is applicable as a jury instruction given the facts of the case.

Plaintiffs' counsel's request for a new trial based on errors in jury instructions is hereby denied.

### *Time Limit on Jury Deliberations*

Plaintiffs' counsel next argues in the motion for post-trial relief that a new trial is necessary because the trial court placed a "time limit on the jury's deliberations." This mischaracterizes the court's attempt, throughout the entire trial, to bring as much certainty as possible into the trial schedule out of consideration for the jurors.

In plaintiffs' pretrial memorandum, plaintiffs' counsel advised the court that the trial would take five days. The matter of trial timing was next addressed on the record on Thursday, August 4, at the motions hearing.

"The Court: The other thing, Ms. Fullam, can this case, whole case, be done in five days?

"Ms. Fullam: I certainly think so." (Motion Tr. August 4, 2005, 17:13 through 17:17.)

Following the formal hearing, the court met off the record with counsel to discuss scheduling.

"The Court: Suppose I meet with trial counsel after we're done with these motions and we'll talk about the scheduling." (Motion Tr. August 4, 2005, 18:11 through 18:13.)

Following the assurances from counsel as to the length of the trial, the court made the following statement to the jury at voir dire, without any objection from counsel.

"The Court: This case, I can promise you, will be over, concluded, totally finished, including the verdict, by Fri-

day. So any of you who have vacation plans to start next Saturday, please don't come up and ask me if you will be away next Saturday for your vacation. I promise you that you will be. And, in fact, if we find that for some reason we get thrown off schedule for some reason or other a little bit, then we simply start earlier in the morning or possibly run a little later in the evening." (Trial Tr. vol. 1, 29:10 through 29:20.)

This statement was made preceding the court's granting of hardship discharges from jury duty. We knew the schedule of testimony, and had received repeated assurances from counsel that the matter could be concluded by Friday. Moreover, we made it clear that we would work longer days if necessary in order to keep our commitment to the jurors.[10] At no time was the jury informed that a Friday completion was necessary for the court's schedule, but only for theirs.

Plaintiffs' counsel argues that the Superior Court has disapproved of setting time limits on jury deliberations, citing *Commonwealth v. Kennedy,* 229 Pa. Super. 189, 323 A.2d 384 (1974). In *Kennedy,* after the trial, the jury entered deliberations at 11:30 a.m. They returned to the courtroom at 4 p.m. and asked for further instructions. The jury then informed the judge that in light of the jury instructions, further deliberations would be futile. The

---

10. We are unable to confirm or deny plaintiffs' counsel's claim that we represented that the court was going on vacation on Saturday, August 13, 2005. This is not a matter of record and we do not recall what we might have told the attorneys in order to encourage their diligence. In fact, although no sessions of court were scheduled for the following week, the judge was not away until Thursday, August 18, 2005.

judge then ordered that a sealed verdict be taken from the jurors of either "guilty," "not guilty," or "no verdict" and that this verdict be returned by 9 p.m. This case is obviously inapplicable here, as we at no time presented the jury with a deadline for deliberations.

Furthermore, the trial judge in a civil case has much wider latitude in conducting the trial. Pa.R.C.P. 223. While we do not suggest that a judge may limit the time of jury deliberations in a civil case, it is a matter of simple logic that each and every time a judge conducts a trial, decisions must be made as to the efficient and fair use of the jury's time, including a decision as to what time it is reasonable to send a jury out into deliberations, and how long it is reasonable to continue deliberations.

We agree that by stating our intention to keep our commitment to the jury that the case would end on Friday, and that by sending them into deliberations on Friday, that the jury might have concluded there was a de facto limit on the jury's deliberations. In this instance, we sent the jury into deliberations around the lunch hour, which afforded a reasonable time of at least 11 or 12 hours if the jury desired. Moreover, the jury was never advised that they could not ask for more time if needed. The only way to know that the jury did not receive adequate time for deliberations would be if we had refused them additional time after a reasonable request. This did not come to pass, inasmuch as the jury returned their verdict at 4:30 p.m.

Plaintiffs' counsel would have us believe that the verdict of "no liability" was somehow the result of the desire of the jurors to leave early on a Friday, or the jurors' fear of the dark, or the intimidation of the jurors by the court. There is simply nothing to suggest this conclu-

sion. The jurors behaved throughout the trial with dignity and attention, as Ms. Fullam recognized in her closing argument to the jury.

"Ms. Fullam: . . . And on behalf of everyone in the courtroom, I just want to say thank you before even getting started because of the very obvious attention that every one of you has paid, in long days and cold temperatures, to some complicated testimony and some emotional testimony.

"And we are here seeking justice and placing the ultimate decision about what the true facts are in the hands of the citizens of the Lehigh Valley. And it's a great thing. And all that anyone asks for is what you have done so far, and that is to treat the matter with the utmost seriousness, to recognize how important this matter is, and to deliberate in a reasoned, responsible, and fair manner based on the evidence that we've presented." (Trial Tr. vol. 5, 1078:19 through 1079:9.)

The only thing that changed from the time that Ms. Fullam praised the jury was that the jury returned an unfavorable verdict. It is only when an unwelcome verdict was returned that the plaintiffs now find fault with the jury's willingness to perform their responsibilities.

The record in this case is replete with instances in which the court made it clear that the jury had as much time as it needed to reach a verdict. In order to alleviate the concerns of plaintiffs' counsel that the jury would rush through its deliberations, we made inquiry of the jury to discover whether any jurors would attempt to reach a hasty verdict.

"The Court: But the fact of the matter is, we don't send you out and say you have an hour to decide this

case, you have two hours to decide this case. The case takes as long as it takes to decide the case. And one of the things I do want to be sure about, because it is a Friday afternoon, it's August, and I want to be sure that we don't start with a jury of 12 and then someone at, you know, 3 p.m. this afternoon says, oh, by the way, I have to leave on vacation and, you know, whatever.

"So is there anybody in the first 12 jurors who feels that they have any pressing obligations or desires that would keep them from spending a full day and possibly early—into the early evening on deliberating on this case to the—as long as it needs your attention?

"Is there anybody on the first 12 who has that kind of issue? All right. I'm going to ask that question again as we go along because once we go into deliberations, we will be excusing the two alternates, so I'm going to be depending on the first 12.

"And I'm depending on the first 12 to give this case their full attention until it has received all the attention from you that it deserves in its deliberations." (Trial Tr. vol. 5, 1072:14 through 1073:15.)

Plaintiffs' position puts the court in a no-win situation. Although counsel expressed concern that the jury would rush, counsel now expresses unhappiness that we made every effort to be sure that the jury would not so rush.

Plaintiffs' counsel also complains that the court tried to intimidate the jury into rushing by suggesting that they would be in danger on the streets of Allentown if they failed to reach a verdict before dark. The record contradicts plaintiffs' counsel's assertion.

Specifically, the court stated:

"The Court: I understand that some of the jurors are concerned about their—I guess you're parked somewhere in kingdom come, right, that these days we wouldn't want you going in the dark to get to your vehicles, and if we would be going into that point in deliberations, we most certainly would make arrangements for you to return your vehicles either into the courthouse or into the parking lot immediately adjacent to the courthouse at some point during your deliberations and during daylight hours. So I didn't want you to be concerned about that." (Trial Tr. vol. 5, 1144:3 through 1144:13.)

Accordingly, the motion for a new trial with regard to these grounds is denied.

### Disjoinder of the Verdict

Plaintiffs' counsel next argues that a new trial is necessary because the trial court divided the jury questions into two separate inquiries. On the day before deliberations began we advised counsel that we intended to instruct the jury on liability and damages separately and have them to deliberate first on liability. Plaintiffs' counsel objected.

"Ms. Fullam: It suggests to the jury on a Friday afternoon in the summer time that if they answer this question first, they're out of here. And it may not be relevant, but I've never had it happen before in 22 years, but I haven't—

"The Court: To be perfectly honest, I've never done it before in 20 years, and I think this jury is highly conscientious. I don't think that there's going to be any issue with regard to that. I think it will considerably speed

their deliberations because it will focus them on the proper topic at the proper time." (Trial Tr. vol. 997:3 through 997:14.)

The following day, on August 12, 2005, we more clearly stated the rationale for choosing to disjoin the questions to the jury:

"The Court: So, number one reason [for disjoinder] is because of the length of the instruction; number two is because of the complexity of the instruction; number three is because this is an extremely emotional case. It is a heart-wrenching case. It is a case where if there was ever a danger of emotion or sympathy influencing the verdict of the jury, this is that case. And, therefore, there is a high degree of risk that prejudice would inure to the defendant simply because of sympathy with the plaintiff. The language of the cases, particularly the *Stevenson* case, sets the standard, which is bifurcation should be granted only to promote convenience and avoid prejudice. And I think that this disjoinder accomplishes the same goal. It promotes convenience, and it avoids prejudice." (Trial Tr. vol. 5, 1013:4 through 1013:21.)

In the motion for post-trial relief, plaintiffs' counsel argues that there was no reason to disjoin the questions to the jury in the first place, and second, that as a result of the disjoinder, plaintiffs were prejudiced by the decision because the jury reached a hasty decision on liability so as to avoid having to sit through instructions on damages. We disagree.

The Pennsylvania Supreme Court in *Stevenson v. General Motors Corp.,* 513 Pa. 411, 521 A.2d 413 (1987) did not proscribe the use of bifurcated trials whereby determinations of liability and damages are made sepa-

rately. The Supreme Court merely cautioned that the decision to bifurcate should only be made after the careful consideration of the trial judge. *Stevenson,* 513 Pa. at 422, 521 A.2d at 419. In fact, the court cited to policy considerations which support the practice of separating a trial into liability and damages components. Specifically, the *Stevenson* court stated,

"A number of policy considerations have been forwarded to support separating the trial on liability from damages in the personal injury context. One advantage often mentioned is that this separation obviates the expense of preparing for trial on damages until liability has been found. Note, *Implications of Bifurcation in the Ordinary Negligence Case,* 26 U.Pitt.L.Rev. 99, 110 (1964). The stimulus to settle after the finding of liability is also perceived as an important advantage of bifurcation. Zeisel and Callahan, *Split Trials and Time Saving: A Statistical Analysis,* 76 Harv.L.Rev. 1606, 1608 (1963). Apparently, in the instant case, the appellants hoped to avoid procuring costly discovery on damages until needed and the appellee sought to secure an opportunity to re-evaluate its position upon a finding of liability but prior to the returning of a large judgment." *Stevenson v. General Motors Corp.,* 513 Pa. 411, 415-16, 521 A.2d 413, 415-16 (1987).

In the case at hand, of course, there was not a bifurcation as seen in *Stevenson* where there were separate trials for liability and damages. Instead, we proceeded on the basis of two separate submissions to the jury, a submission on liability and, if necessary, a submission on damages. The same rationale in *Stevenson* applies to separating jury deliberations into a submission on liability followed by, if necessary, a submission on damages.

One purpose of presenting two separate inquiries to the jury was to save time in the event that the jury found no liability on defendant's behalf. The goal of promoting settlement between the parties is also a valuable consideration, because the parties might have been amenable to settlement in the time following a jury determination that liability existed.

The separation of inquiries presented to the jury also served to reduce unfair prejudice to the defendant. Given the tragic factual circumstances of the case, there was a significant chance that the jury would allow sympathy for the plaintiffs' loss to affect their determination of liability with respect to defendant. It was important to focus the jury's attention on the determination of whether the defendant met the requisite standard of care.

Subjecting the jury to instructions on both liability and damages in such complicated cases would be confusing. Medical malpractice liability is not what the popular media portrays. The damage instructions were also destined to be complicated in this case, involving, as they did, damage claims of the plaintiffs' individually and as representatives of Madison Craddock's estate, which included both a survival action and a wrongful death action.

By giving only the liability instructions and then asking for a verdict with respect to liability, we simplified the task for the jury into manageable portions, reduced the risk of confusion and reduced the likelihood of prejudice.

Accordingly, plaintiffs' counsel's request for a new trial is denied on these grounds.

*"Improper" Verdict Slip*

In the motion for post-trial relief, plaintiffs' counsel next argues that a new trial is necessary because the trial court did not include a question in the jury interrogatories asking whether defendant caused harm to the plaintiffs, Jessica and Brian Craddock.

At trial, we overruled plaintiffs' counsel's objection to the verdict slip as follows:

"The Court: No, no, we're going to give them the first two questions of the jury verdict slip which both of you have submitted. Was there negligence? Was there causation in causing the death of the baby? That is the fundamental foundation of the entire trial, and the jury's going to answer that question before they answer any other questions.

"Ms. Fullam: Your honor, then I—if the court intends to do that, then I believe the proper way to express the causation question is did they cause the harm to plaintiffs? It's not merely the death of the baby.

"The Court: It is only the death of the baby.

"Ms. Fullam: But Jessica Craddock was a victim of malpractice as well, your honor.

"The Court: If—if he caused the death of the baby—if his negligence caused the death of the baby, Ms. Craddock was a victim. If he didn't cause the death of the baby, I don't recall any specific evidence about malpractice, other malpractice, with regard to Jessica.

"Ms. Fullam: Because, your honor, with respect to the failure to perform an ultrasound or to evaluate the baby, and, in addition, the fact that she had to experience the

trauma in the hospital, that all of that is a consequence of the malpractice of Dr. Viechnicki upon her.

"The Court: But only if his malpractice—only if his—only if, negligence, if the jury finds it, caused the baby to die. Let's look at it this way. Suppose that Dr. Viechnicki—let's suppose for the sake of this analogy, that Ms. Craddock had—had expressed to him concern and that she was deeply concerned. He didn't order an ultrasound. She went into the hospital. He wasn't there right when she got there. He showed up later. He dressed in street clothes. I'm just assuming these things to be true. I'm not saying they are true. Let's say for the analogy they were all true; that he had a resident deliver the baby; that he was, in Ms. Craddock's words, mean to her, suppose all of those things to be true; but that Madison had been born alive and healthy, would you have a malpractice case?

"Ms. Fullam: Yes, your honor, it might have limited value, but yes.

"The Court: In what respect?

"Ms. Fullam: Because he has a responsibility to satisfy the standard of care in the management of his maternal patient, not merely to achieve a live birth.

"The Court: And what was the harm—what would be the harm that you would be describing to the jury in that case?

"Ms. Fullam: We have posttraumatic stress disorder about which there was some testimony, your honor, the breach of trust, the expectation, the abandonment in the hospital for a period of—for an extended period of time, the—the fact that she had to wait for Dr. Sarno to come

to actually give her the information she needed to make the decision.

"The Court: Well, no, in the context of a live birth, what would be the harm? I didn't hear anybody testify on the standard of care that an OB doctor has to otherwise give an ultrasound or otherwise deliver the baby himself. No, it's—the death of the baby—if the doctor caused the death of the baby, and the jury finds that, then there is no doubt that Miss Craddock has her own substantial claim.

"Ms. Fullam: Well, let me give your honor another possibility, and that is that the jury might decide that the baby would have been alive, born alive, but damaged, or born alive and survived for a period and then died. It's not either or, born completely healthy or born stillborn.

"The Court: No, there's no evidence that the jury could speculate any of those things. All right." (Trial Tr. vol. 5, 1034:21 through 1038:7.)

Plaintiffs' counsel's argument that the trial court gave the jury an improper jury slip is clearly without merit. As discussed *supra,* the *Vallone* court stated, "[i]t is hornbook law in this Commonwealth that a trial court should not charge the jury on a concept that is not supported by the evidence." *Vallone,* 820 A.2d at 765. In this case, the verdict slip was appropriately limited to addressing only the matters supported by evidence at trial. Specifically, the trial testimony centered around defendant's failures to order further testing in response to decreased fetal movement, low estriol levels and low fundal height development, resulting in the baby's death.

Plaintiffs' medical expert, Dr. Russel Dale Jelsema, addressed how the failure to test affected the life of Madi-

son Craddock *in utero.* There was no mention of the standard of care with respect to protecting the health and mental well-being of the mother.

At various times in plaintiffs' case, references were made to other wholly unrelated actions taken by defendant that may or may not have harmed Jessica Craddock. For example, testimony was given that Dr. Viechnicki did not deliver the baby himself[11] and that Dr. Viechnicki commented, "sometimes these things happen."[12] No standard of care was ever produced with respect to these actions. Therefore, pursuant to *Vallone,* there was no need to address the effect of these actions on the plaintiffs beyond the unfortunate death of Madison Craddock. The only applicable standard of care presented by plaintiffs' counsel was with regard to protecting the life of the child after a doctor observes symptoms indicating decreased fetal movement, low estriol levels and a low fundal height.

Accordingly, plaintiffs' motion for a new trial due to an improper verdict slip is denied.

## *"Failure to Make a Record" of Plaintiffs' Motion To Strike Juror 28*

Plaintiff next argues that a new trial is necessary because the trial court failed to make a record of plaintiffs' motion to strike Juror 28.

This allegation of error is factually incorrect.

11. See N.T. volume 4, Aug. 11, 2005 at 772.
12. N.T. volume 4, Aug. 2005 at 741. See also, N.T. volume 4, Aug. 11, 2005 at 770 ("he didn't even say sorry for our loss").

We agree there is no record of plaintiffs' motion to strike Juror 28, for the reason that no such motion was made. The record speaks for itself in this matter.

Trial counsel is highly experienced. She has had the transcript since early September, and if she believed that the motion to strike Juror 28 was omitted from the transcript, she should have requested the court for a hearing to correct the transcript as is required by the rules of appellate procedure. In fact, even in her post-trial motions and brief in support thereof, she fails to make such a motion or request a hearing, as required by the rules.

Plaintiff's counsel cursorily "attests" in the post-trial motions that such a motion was made. Had the motion been made and denied, surely plaintiffs' counsel would have used a peremptory challenge on the juror, which she did not. We point this out not to suggest that the use of a peremptory would have cured the error, but to point out that plaintiffs' counsel never wished to remove the juror.

The motion was not made, and the alleged error is waived.

### The Tipstaff's Inquiries to the Jury During Deliberations

Plaintiffs' counsel next argues that a new trial is necessary because the court's tipstaff made inquiries of the jury during deliberations.

We have no idea what counsel is talking about. Was it asking the jury members if someone wished to take a smoke break? Was it asking the jury members if anyone wished anything to eat? Admittedly, we permit our staff to make such inquiries to the jury during deliberations,

and such inquiries are customarily not made part of the record. We NEVER permit the staff to inquire of the jury as to when they will be finished with deliberations.

If plaintiffs' counsel was aware of improper inquiries to the jury during deliberations from the court's staff, then she was obliged to bring this to the court's attention immediately, so that the problem could be corrected (and so that a record could be made).

The record does not reflect any such concerns.

We find the case of *Welshire v. Bruaw,* 331 Pa. 392, 200 A. 67 (1938), cited by plaintiffs' counsel, to be interesting. Specifically, the tipstaff was intoxicated and put time constraints on the jury's deliberations by telling them that they would get "the devil" if they did not reach a verdict by a certain time. We are confident that a similar event did not occur here, both with regard to intoxication and to rushing the jury.

## JUDICIAL MISCONDUCT

### *Recusal*

Plaintiffs' counsel alleges "the trial judge and Dr. Viechnicki attend the same church and have for a considerable amount of time. Counsel recently learned of the existence of this situation and, therefore, the instant motion brings the issue to the court's attention with reasonable promptitude."

We are not entirely certain when plaintiffs' counsel first became aware of the tenuous connection between the court and Dr. Viechnicki. We know that it was at a time when both counsel were in court in an attempt to settle the case, and believe that it may have been at a

pretrial conference on September 9, 2004. It may have been some time closer to trial, but with certainty it was at a conference that took place several days, if not weeks or months prior to trial. Counsel had more than ample time to raise the issue by motion prior to trial, even if she only had time to make an oral motion.

By failing to make a motion and to preserve the record, plaintiffs' counsel has missed the opportunity for factual development of this issue, and has also waived the issue.

We have no concern whatsoever that our tenuous connection with Dr. Viechnicki presented a conflict. Furthermore, the court was the one who made plaintiffs' counsel aware of the connection. Because no motion was filed, we were unaware that plaintiffs' counsel was concerned about a connection.

Had a motion been made and a record been developed, the following would have been shown: That at a conference where the court was trying to settle the case, we spoke privately with each counsel after receiving the consent of the opposing counsel. In speaking privately to Ms. Fullam, I said as follows: "I know Dr. Viechnicki as a member of my church from a long time ago. I do not know him personally, nor have I ever socialized with him, but perhaps the knowledge I have can be useful in settling the case."

I would have been happy to answer further questions, or offer further explanation to Ms. Fullam, either then, or later, in a hearing, or to both counsel, or privately with the consent of opposing counsel. If she had made further inquiry, she would have learned the following: That Dr. Viechnicki and I at one time happened to belong to the same Roman Catholic parish in Allentown, St. Thomas

More; that I would occasionally observe Dr. Viechnicki at services there; that I do not recall ever having a conversation with Dr. Viechnicki; that the parish encompassed, at that time, 1,200 families; that I do not recall ever being at a social event, church event, or other event at which Dr. Viechnicki was present; that my "knowledge" of Dr. Viechnicki extended to an assumption that he was a man who practiced his faith; that I last belonged to, and participated in, that parish 15 years ago.

The trial judge was merely an acquaintance with defendant, which is by no means sufficient grounds for recusal. In *Commonwealth v. Perry,* 468 Pa. 515, 364 A.2d 312 (1976), the presiding judge was an acquaintance of the victim in a murder prosecution. The Pennsylvania Supreme Court said the trial judge's mere acquaintance with the victim could not give rise to an appearance of impropriety, bias or prejudice against the defendant. "[I]t would be an unworkable rule which demanded that a trial judge recuse [himself] whenever an acquaintance was a party to, or had an interest in, a controversy. Such a rule ignores that judges throughout the Commonwealth know and are known by many people, some of whom may eventually be the victims of a crime, and assumes that no judge can remain impartial when presiding in such a case . . . ." 468 Pa. at 525, 364 A.2d at 318.

By failing to make a timely motion, counsel has waived the issue. Once the trial is completed with the entry of a verdict, a party is deemed to have waived his right to have a judge disqualified, and if he has waived that issue, he cannot be heard to complain following an unfavorable result. *Commonwealth v. Corbin,* 447 Pa. 463, 291 A.2d 307 (1972). In order to preserve an issue for

appeal, plaintiff had to make a timely, specific objection at trial and raise the issue on post-trial motions. It was not enough to raise new grounds for the first time in post-trial proceedings. *Reilly by Reilly v. SEPTA,* 507 Pa. 204, 489 A.2d 1291 (1985).

"[W]hen challenges are made concerning the necessity for the recusal of a judge, an important public question is being addressed which we, as responsible representatives of the people, must resolve. However, where the challenge is made for the first time after verdict, in post-trial motions or in arguments and briefs before the appellate courts, different considerations come into play.

"Charges of prejudice or unfairness made after trial expose the trial bench to ridicule and litigants to the uncertain collateral attack of adjudications upon which they have placed their reliance. One of the strengths of our system of justice is that once decisions are made by our tribunals, they are left undisturbed. Litigants are given their opportunity to present their cause and once that opportunity has passed, we are loathe to reopen the controversy for another airing, save for the greatest of need. This must be so for the security of the bench and the successful administration of justice. Accordingly, rules have developed for the overturning of verdicts and judgments for after-acquired evidence. In our view, recusal motions raised after verdict should be treated no differently than other after-acquired evidence situations which compel the proponent to show that: (1) the evidence could not have been brought to the attention of the trial court in the exercise of due diligence, and (2) the existence of the evidence would have compelled a different result in the case." *Reilly by Reilly v. SEPTA,* 507 Pa. 204, 225, 489 A.2d 1291, 1301 (1985).

*Judicial "Intemperance"*

The final argument of the plaintiffs is that a new trial is necessary because "the court reprimanded or was otherwise antagonistic towards plaintiffs' counsel."

The plaintiffs' brief refers the reader to the motion for post-trial relief for the particular instances in support of its argument. The specifics are set forth in paragraph 20 of the plaintiffs' post-trial motions: "repeatedly admonishing plaintiffs' counsel in the presence of the jury, in threatening 'dire consequences to the plaintiffs' case' in the presence of her clients if counsel persisted in her efforts to create and maintain a record for purposes of appeal, in characterizing plaintiffs' counsel's exceptions to the court's rulings as 'bitching' and instructing counsel to 'stop crying over spilt milk.' "

Plaintiffs' counsel does not cite to the record to show these alleged intemperate behaviors. This is understandable because plaintiffs' counsel did not have the benefit of a transcript at the time post-trial motions were filed. However, the transcript was provided to counsel well in advance of the due date of the brief and citations are still lacking.

Counsel complains that we repeatedly admonished plaintiffs' counsel in the presence of the jury. Our review of the record in its entirety reveals a pattern to the contrary. The record demonstrates an evenhanded approach toward both counsel. We made rulings, and expected them to be followed. We made rulings, and did not wish to revisit them. We treated all counsel and parties with utmost respect throughout the entire proceeding. Defense counsel was not immune from the court's directives, but unquestionably plaintiffs' counsel was

subject to far many more adverse rulings for reasons we will explain shortly. However, all such rulings were made without any personal criticism of the attorney, or criticism of the plaintiffs' case, and most definitely without animosity. There is no statement made that demonstrated a partiality to the defendant.

The regrettable fact is that any "repeated admonishments" were necessitated by repeated disregard by plaintiffs' counsel of our evidentiary rulings. The transcript does not contain any negative ruling or "admonishment" which was not actually provoked by Ms. Fullam's refusal to accept our rulings.

Just as we are confident that Ms. Fullam's disregard for our rulings was not motivated by personal animus, but out of care and concern for her clients, our rulings were not motivated by personal animus, but out of a responsibility to maintain order, control, and respect, and to expose the jury only to those matters that we had ruled admissible.

In fact, we extended considerable patience and courtesy to Ms. Fullam. For example, after Dr. Jelsema testified, the court wished to press on with additional testimony. Even though the schedule was a matter of importance, when Ms. Fullam asked to end the trial day early so she could personally return Dr. Jelsema to the Philadelphia airport, we accommodated her without question or reproach.

The court always treated the plaintiffs themselves with the utmost respect. We felt great sympathy for their tragic loss, as demonstrated on August 11, 2005, when, after the jury left the courtroom following plaintiffs' testimony, we told the plaintiffs:

"The Court: What we're doing here in this courtroom is really a question of a legal issue of proof and what the jury believes is the proof in this case with regard to whether or not Dr. Viechnicki acted within the standard of care duties that he had.

"And when the case comes down to it, at the end, that is what the verdict is going to be about. But I don't think it would be right for you to leave this courtroom, at the end of the trial, or even right now, after having told us about your suffering, which I think almost everyone can understand without having heard about it, but I think that you deserve to hear from a human being in this cold courtroom, and I think what I say is for everybody in the courtroom, everybody in the courtroom, that we are so very sorry for your loss, and we all feel that loss for you." (Trial Tr. vol. 4, 795:9 through 796:1.)

A party is not entitled to a new trial simply because the trial court chastises trial counsel, unless the criticism reflects animosity towards or disbelief of the chastised party, or partiality favoring the opposing party. *Commonwealth v. Correa,* 423 Pa. Super. 57, 620 A.2d 497 (1993). In *Correa,* the court found that there were no grounds for a new trial based solely on an acrimonious relationship between defense counsel and the trial judge. Specifically, the appellate court considered whether the defendant was prejudiced by the acrimonious relationship with the trial judge by focusing on whether the jury was present when the hostilities occurred, whether such comments were made at side-bar, and whether the court was acting under its proper authority to control the proceedings. See *id.* at 72, 620 A.2d at 505.

Counsel argues that a new trial is necessary because the trial court's alleged antagonistic and demeaning be-

havior towards plaintiffs' counsel occurred in front of the clients, the Craddocks. In *Correa,* the court refused to even consider whether the acrimony occurred before the client. See *id.* The inquiry was limited to the possible prejudicial effect of such hostility on the jury's decision-making efforts. See *id.* Whether the alleged antagonism occurred in front of counsel's clients is beside the point. The important consideration is whether the jury was influenced by any antagonism between counsel and the trial judge. Inasmuch as plaintiffs' counsel concedes that the jury was not exposed to the alleged acrimonious statements, there could be no prejudice.

Furthermore, plaintiffs' counsel has also suggested that there were acrimonious comments made by the trial court that do not appear on the record. If plaintiffs' counsel believed that there was something said in the courtroom that should have been included on the record, she had the option of requesting that the trial court include the statement on the record. Plaintiffs' counsel never did so. Furthermore, plaintiffs' counsel had the option of correcting or modifying the record pursuant to Pa.R.A.P. 1926. Pa.R.A.P. 1926 states: "If any difference arises as to whether the record truly discloses what occurred in the lower court, the difference shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth." Plaintiffs' counsel did not pursue this option either, and after its inspection of the notes of testimony, has submitted no differences in testimony to be settled. Plaintiffs' counsel has not requested that any specific unprofessional statements be included in the record because none exist.

Finally, plaintiffs' counsel alleges that the court refuses to allow her access to audiotapes, the suggestion being that the transcript was altered. The record was stenographically transcribed and no audiotapes were ever made.

We are quite frankly surprised that plaintiff's counsel raised the issues that suggest bias and misconduct on the part of the trial judge and the judge's stenographer. While we are sympathetic to the pressures that counsel is under in such a situation, we believe that counsel's emotional involvement in the case has colored not only her perception, but her actual recollection of events. However, the record proves that the misconduct, if any, was in plaintiffs' counsel's persistent refusal to accept our rulings. To lay blame and accusations where they are not warranted brings into question the impartiality of the judiciary and the integrity of court employees when there are no facts to support such claims.

We dealt with counsel's recalcitrance in the most respectful manner available, consistent with our responsibility to maintain control of the courtroom and to ensure that our rulings were followed.

Therefore, because we find no error committed by the trial court with respect to evidence, the jury or judicial conduct, plaintiffs' request for a new trial pursuant to its motion for post-trial relief is hereby denied.